**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**STEPHEN H. GOLDMAN,**

**Plaintiff,**

**-vs-** **Case No. 6:04-cv-725-Orl-28JGG**

**BRACEWELL & GIULIANI, L.L.P., NANCY A. WODKA, JOHN R. BRANTLEY,**

**Defendants.**

---

## ORDER

Plaintiff Stephen H. Goldman ("Goldman") brought the instant action against Defendants Bracewell & Giuliani, L.L.P., Nancy A. Wodka ("Wodka"), and John R. Brantley ("Brantley") (collectively "Bracewell & Giuliani") alleging claims of legal malpractice, breach of fiduciary duty, and negligent misrepresentation. This cause is before the Court on cross-motions for summary judgment. Upon careful consideration of the parties' motions and their responses thereto, Plaintiff's motion (Doc. 183) must be denied and Bracewell & Giuliani's motion (Doc. 128) must be granted.

### I. BACKGROUND

Goldman was formerly the majority shareholder, director, president, and CEO of Distributed Processing Technology, Inc. ("DPT"), a company which developed and manufactured disk controllers for use with computer mass storage devices (e.g., disk drives, tape drives, and CD-ROM drives), including Redundant Array of Independent Disks ("RAID")

boards. On December 3, 1999, DPT and Goldman entered into a merger and acquisition agreement with Adaptec, Inc. ("Adaptec"). The merger between DPT and Adaptec closed on December 22, 1999. Throughout the negotiations between DPT and Adaptec, DPT was represented by the law firm of Bracewell & Giuliani. The parties in this case dispute whether Bracewell & Giuliani also represented Goldman during the negotiations.

As party to the merger contract between Adaptec and DPT, Goldman agreed to be individually liable for any breach of representation or warranty made by or about DPT. In connection with Goldman's agreement, Adaptec held back $18.5 million of the $235 million that it agreed to pay for DPT. The function of this holdback or reserve amount was to compensate Adaptec in the event that any representations or warranties made by or on behalf of DPT were breached.

As of the time that Adaptec and DPT began their negotiations, DPT's principal source of revenue derived from sales to Sun Microsystems, Inc. ("Sun"). However, prior to the execution of the merger agreement between Adaptec and DPT, Sun had issued a stop-ship order on all products from DPT. Subsequent to the merger agreement, problems with Sun persisted, prompting Adaptec to terminate its relationship with Sun.

In December 2000, Adaptec brought a claim for recovery against the $18.5 million reserve fund on the basis that certain warranties in the merger agreement had been breached. Pursuant to the terms of the merger agreement, the matter was submitted to arbitration. During the course of the arbitration proceedings, Adeptec learned that Goldman and DPT failed to disclose forecasts of decreased sales by DPT to Sun which Sun had performed for DPT. Accordingly, Adaptec amended its complaint against Goldman to

include claims of fraud, fraud in the inducement, and negligent misrepresentation. The arbitrator found in favor of Adaptec on its claim for recovery of the holdback amount and also found that Goldman negligently misrepresented DPT's forecasted sales to Sun. Following the arbitrator's decision, Goldman settled the claims against him in the amount of $51 million.[1]

## II. GOLDMAN'S CLAIMS

Goldman bases his claims against Bracewell & Giuliani on the theory that the firm negligently misrepresented him during his negotiations with Adaptec, thereby causing him to be liable to Adaptec in the sum of $51 million. Goldman specifically alleges that Bracewell & Giuliani failed: (1) to advise him to disclose DPT's actual and projected sales to Sun; and (2) to include "a full warranty disclaimer" in the merger agreement or to otherwise advise him of the effect of the warranty disclaimer provided for in § 2.22 of the merger agreement. See Doc. 135, at 13-20.

## III. SUMMARY JUDGMENT STANDARD

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of establishing that no genuine issues of material fact remain. Celotex Corp. v. Catrett, 477 U.S. 317 (1986).

---

[1] This included the $18.5 million holdback amount (plus interest) and $31 million in damages that were assessed against Goldman personally.

When faced with a "properly supported motion for summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations." Gargiulo v. G.M. Sales, Inc., 131 F.3d 995, 999 (11th Cir. 1997). "The evidence presented cannot consist of conclusory allegations or legal conclusions." Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991); see also Fed. R. Civ. P. 56(e) (providing that nonmovant's response "must set forth specific facts showing that there is a genuine issue for trial").

In ruling on a motion for summary judgment, the Court construes the facts and all reasonable inferences therefrom in the light most favorable to the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986). However, summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. Moreover, "at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249.

"Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative." Sawyer v. Southwest Airlines Co., 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (citing Anderson, 477 U.S. at 250-51). "'In a response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial.' Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party

must prevail as a matter of law.'" Id. (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988) and Anderson, 477 U.S. at 251-52); see also LaRoche v. Denny's, Inc., 62 F. Supp. 2d 1366, 1371 (S.D. Fla. 1999) ("The law is clear . . . that suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment.").

## IV. ANALYSIS

The two critical issues presented by the parties' motions are, first, whether an attorney-client relationship existed between Goldman and Bracewell & Giuliani and, second, whether there is any evidence that Bracewell & Giuliani's alleged negligence proximately caused Goldman injury. As explained below, an issue of material fact remains as to the first issue; however, because Goldman has failed to submit evidence that "presents a sufficient disagreement to require submission to the jury" on the issue of proximate causation, summary judgment must be awarded to Bracewell & Giuliani.

### A. Attorney-Client Relationship

In the absence of a formal agreement, "the test for determining the existence of an attorney-client relationship hinges upon the client's reasonable subjective belief that he is consulting a lawyer in that capacity with the intention of seeking professional legal advice." Keepsake, Inc. v. P.S.I. Indus., 33 F. Supp. 2d 1033, 1036 (M.D. Fla. 1999). In this instance, although the record clearly supports Goldman's contention that he had cause to reasonably believe that Bracewell & Giuliani was representing him during the negotiations with Adaptec, it is not so clear that he *actually* believed that was the case.

Goldman points to several salient facts in arguing that Bracewell & Giuliani represented him: (1) Bracewell & Giuliani advised Goldman that he would be a party to the

merger agreement and that in that capacity he would be making certain warranties and representations about DPT; (2) Bracewell & Giuliani negotiated the liability cap contained in § 2.22 of the merger agreement and attempted to negotiate a warranty disclaimer that prohibited Adaptec from relying on DPT's financial projections; and (3) Bracewell & Giuliani negotiated Goldman's employment agreement with Adaptec. These facts, taken together with the fact that DPT was a closely held corporation which had Goldman as its majority shareholder, sufficiently establish that Goldman could have reasonably believed that he was being represented by Bracewell & Giuliani. Furthermore, assuming that Goldman did, in fact, believe that Bracewell & Giuliani was representing him, the record contains no evidence that Bracewell & Giuliani said or did anything to dispel that notion.

Whether Goldman actually held a subjective belief that he was being represented by Bracewell & Giuliani is, however, another matter. In a deposition that Goldman gave in the course of the arbitration proceedings brought by Adaptec, he testified as follows:

> Q: And lastly, Mr. Goldman, during the negotiations and closing of [the merger] transaction, were you personally represented by a lawyer?
>
> GOLDMAN: No, I was not.

(Adaptec, Inc. v. Goldman, Arbitration Proceedings, No. 1100033828, Doc. 128, Tab 6, at 1189). While there is certainly support in the record for Goldman's contention that he subjectively believed that he was being represented by Bracewell & Giuliani, the above excerpted deposition testimony suggests that he may have believed otherwise. Thus, were this case to proceed, the issue of Goldman's subjective belief regarding the nature of Bracewell & Giuliani's representation would remain to be resolved.

**B. Proximate Causation**

In order to prevail on any of his claims, Goldman must establish that the negligence of Bracewell & Giuliani proximately caused him injury. Goldman's claim of damages in the amount of $51 million derives principally from two sources: (1) the arbitrator's assessment of damages against the reserve fund in the amount of $18.5 million; and (2) the arbitrator's assessment of damages against Goldman for misrepresentations concerning projected sales by DPT to Sun.[2] According to Goldman, the damages assessed against him by the arbitrator were the proximate result of Bracewell & Giuliani's negligent failure: (1) to advise him to disclose DPT's actual and projected sales to Sun; and (2) to include "a full warranty disclaimer" in the merger agreement or to otherwise advise him of the effect of the warranty disclaimer provided for in § 2.22 of the merger agreement.

To satisfy the element of proximate causation, Goldman must do more than merely establish a causal link between Bracewell & Giuliani's negligence and the arbitrator's award of damages. Instead, he must make the far more difficult showing that Adaptec or another

---

[2] Goldman admits that the damages he seeks are the "result of the arbitrator's finding of negligent misrepresentation against [him]." (Pl.'s Resp. to Def.'s Second Req. for Admissions, Dated March 8, 2005, Doc. 128, Tab 1 ¶ 2). The significance of this admission is that it focuses inquiry on the causal link between Goldman's damages and the alleged failure of Bracewell & Giuliani to protect him against liability for representations of DPT's projected sales, as distinguished from any link between Goldman's damages and Adaptec's initial claim against the reserve fund.

Bracewell & Giuliani argues that Goldman never claimed the $18.5 million holdback amount in damages. Because the Court ultimately concludes that Goldman has failed to provide any evidence tending to show that any loss proximately resulted from Bracewell & Giuliani's alleged negligence, the issue of whether Goldman claimed the holdback amount in damages (or whether he had any basis to do so) need not be addressed.

company would have purchased DPT for, at a minimum, an amount greater than $235 million–the amount that Adaptec agreed to pay for DPT–minus the $51 million that Goldman now claims in damages. In other words, he must show that he would have been better off had Bracewell & Giuliani done those things that he claims the firm negligently failed to do–i.e., tell Adaptec or another company about the projected decreases in DPT's sales to Sun or insist on a full warranty disclaimer that would have absolved Goldman of any liability arising from reliance on representations of DPT's projected sales. To make this showing, Goldman must somehow discount the possibility that Adaptec or another company, faced with either full knowledge of DPT's financial prospects or a full warranty disclaimer, would have agreed to purchase DPT only at a substantially discounted price, if at all.

At this stage, Goldman need not prove anything but must provide some evidence that tends to show that, if properly represented by Bracewell & Giuliani, he could have sold DPT for an amount greater than what Adaptec agreed to pay for DPT minus the amount that Goldman paid to settle Adaptec's arbitration claims. Goldman's only evidence is the following note, which the Chief Operating Officer of Adaptec ("COO"), Robert Schultz ("Schultz"), wrote during the course of the arbitration proceedings Adaptec brought against Goldman:

> Sun-Question: Would we have stopped the deal? Would we have re-priced?
> Yes . . . back to $220 [million]; Environment: need DPT RAID . . . .

(Doc. 163, Tab 9). According to Goldman, Schultz's note is a "smoking gun" which establishes, or at least tends to establish, that Adaptec would have only reduced its offer for DPT to $220 million had it been equipped with knowledge that DPT's sales to Sun were

about to drastically decline. Bracewell & Giuliani contends, however, that Schultz's note refers only to what Adaptec would have paid for DPT had it known of Sun's stop-ship order.

In support of his interpretation, Goldman relies on the following testimony provided by Schultz during the course of these proceedings:

> Q: Doesn't this–Mr. Schultz, doesn't this indicate that if–as we just talked about, that if you, at least in your mind as COO of Adaptec, had been aware of the issues that you've talked throughout this deposition today–
>
> SCHULTZ: Right.
>
> Q: —at Sun that you would have as COO of Adaptec repriced the offer at $220 [million]?
>
> SCHULTZ: That's what this says, yes.
>
> Q: Okay. And that's what you wrote, correct?
>
> SCHULTZ: That's what I wrote.

(Dep. of Robert Schultz, Doc. 163, Tab 8 at 119, ll. 9-19). Were this Schultz's only testimony concerning his note, Goldman might well have succeeded in creating an issue of fact for trial. Schultz later clarified in the same deposition, however, that his note referred only to what Adaptec would have paid had it known of Sun's stop-ship order and not what the company would have paid had it known of the projected decreases in sales from DPT to Sun. (Dep. of Robert Schultz, Doc. 174, Tab 90 at 378-79). In fact, Schultz testified that, as of the time he wrote the note, Adaptec had yet to even learn of Goldman and DPT's misrepresentations concerning projected sales to Sun. Id.

Goldman attempts to cast doubt on the veracity of Schultz's clarification by contending that Schultz wrote his note after Adaptec learned that Goldman and DPT misrepresented

forcecasted sales to Sun. However, there is no evidence in the record, other than Schultz's own testimony, which indicates when the note was written. Moreover, even if Goldman's assertion concerning the timing of Schultz's note were true, the only evidence in the record that bears on the meaning of the note supports Schultz's testimony that the note referred only to what Adaptec would have paid for DPT had it known of Sun's stop-ship order. Most telling is the fact that Adaptec's initial complaint against Goldman, which the company brought prior to learning of Goldman's misrepresentations concerning DPT's projected sales to Sun, claimed damages of $15 million–i.e., the exact amount by which Schultz's note suggested that Adaptec would have reduced its offering price for DPT. (See Doc. 174, Attach. A, Tab 87 ¶ 16). The precise correspondence between Schultz's note and Adaptec's initial claim for damages is consistent with the testimony of Andrew Brown, Adaptec's Chief Financial Officer, and Dana Miles, Adaptec's General Counsel, both of whom have testified that knowledge of projected decreases in sales to Sun would have substantially impacted, or even put an end, to Adaptec's negotiations for the acquisition of DPT. (See Dep. of Andrew J. Brown, Doc. 128, Tab 10 at 22, 54-57, 83-84, 141-42, 192-93, 198-214; Dep. of Dana Miles, Doc. 128, Tab 15 at 93-95, 178-80, 205).

Faced only with facts that tend to indicate that Schultz's note has no probative worth for determining what, if anything, Adaptec (or another company) would have paid for DPT had it known of the pending crisis in DPT's sales to Sun, the Court concludes that Goldman has failed to proffer evidence creating a triable issue as to whether Bracewell & Giuliani's alleged negligence proximately resulted in any loss to Goldman. As it stands, Goldman's contentions as to what Adaptec or some other company would have paid for DPT, were such

company aided by full knowledge of DPT's various problems, amount to little more than base speculation. Accordingly, as proximate causation is critical to all of Goldman's claims, summary judgment must be granted in favor of Bracewell & Giuliani.

## V. CONCLUSION

For the foregoing reasons, it is **ORDERED** and **ADJUDGED** as follows:

1. Defendants' motion for summary judgment (Doc. 128) is **GRANTED**.

2. Plaintiff's motion for summary judgment (Doc. 183) is **DENIED**.

3. All other pending motions are **DENIED AS MOOT**.

4. The Clerk is directed to enter judgment in favor of Defendants on all counts contained in Plaintiff's Complaint. Thereafter, the Clerk shall close this file.

**DONE** and **ORDERED** in Chambers, Orlando, Florida this 13th day of October, 2005.

JOHN ANTOON II
United States District Judge

Copies furnished to:
Counsel of Record
Unrepresented Party